**GRIDLEY et al. v. UNITED STATES.**
**GRIDLEY v. SAME.**
**WRIGHT et al. v. SAME.**
Nos. 5576, 5568, 5569.

Circuit Court of Appeals, Sixth Circuit.
Nov. 6, 1930.

J. M. Dunham, of Grand Rapids, Mich., and D. G. F. Warner, of Lansing, Mich. (Jeffries & Krause, of Detroit, Mich., and Dunham & Cholette, of Grand Rapids, Mich., on the brief), for appellants.

J. R. Watkins and G. H. Frederick, both of Detroit, Mich. (David A. Wolff, of Detroit, Mich., on the brief), for the United States.

Before DENISON and HICKS, Circuit Judges, and COCHRAN, District Judge.

ANDREW M. J. COCHRAN, District Judge.

No. 5576 is an appeal from a judgment of conviction under an indictment charging use of the mails to effect a scheme to defraud in violation of section 215, Criminal Code (18 USCA § 338); Nos. 5568 and 5569 are appeals from judgments of conviction for contempt of court committed in the course of the trial of No. 5576. All three appeals will be disposed of in this one opinion.

## No. 5576.

The scheme charged may be thus stated: The persons to be defrauded were members of associations known as "Advocates of Justice for the Descendants of Anneke Jans Bogardus," and particularly those located in the cities of Detroit, Flint, Ann Arbor, and Jackson, Mich. They were to be defrauded by obtaining money from them upon false representations that the defendants possessed and had access to information and evidence which would prove conclusively that such descendants had title to and, by means of such information and evidence, could and would recover certain real estate in New York City, then occupied by the Trinity Church Corporation, hereafter referred to as Trinity Church. That real estate was largely that which constitutes the financial district of New York City, worth many millions of dollars. The indictment charged other features of the scheme, to which it is not necessary to refer. The trial began February 19 and lasted to March 15, 1929. Seventy-one witnesses were heard, thirty for the prosecution and forty-one for the defense. They were mostly members of those associations. Two hundred and twenty-four errors have been assigned. It is important before entering upon their consideration that note should be taken of their background, in the light of which they should be disposed of. That background consists of the case as made by the evidence and the climate of the trial. This calls for much detail.

### Preliminary Statement.

1. There was conflict in the evidence only as to one important fact. Otherwise the facts were beyond dispute. Such was the case as to the title to the property to which the representations charged related, and the right of those descendants to recover it. This is settled by certain reported decisions of the New York courts, rendered nearly one hundred years ago, in two suits brought by certain of such descendants against Trinity Church introduced in evidence by appellee. The first one was brought December 1, 1830, by John Bogardus, one of five children of Cornelius Bogardus, a grandson of Cornelius Bogardus, a son of Anneke Jans. Opinions adjudging that a plea to the bill filed by the defendant was sufficient are reported in Bogardus v. Trinity Church, 4 Paige, 178 and 15 Wend. 111. An opinion on certain motions is reported in 4 Sandf. Ch. 369. The suit was afterwards heard on the merits, and on June 30, 1847, the bill was dismissed. The evidence, arguments of counsel, and opinion of the court, are reported in 4 Sandf. Ch. 633. This suit will hereafter be referred to as John's suit. The second suit was brought and disposed of during the pendency of that suit. It was brought in 1834 and the bill was dismissed on demurrer in 1840. It was brought by the descendants of two of the children of Anneke Jans, on behalf of themselves and such other of the descendants as should come in and contribute to its expense. The opinions rendered on the dismissal are reported in Humbert v. Rector, etc., of Trinity Church, 7 Paige, 195 and Id., 24 Wend. 587. This suit is hereafter referred to as the Descendants' suit.

Anneke Jans was one of the early Dutch colonists of New Amsterdam, now New York City. She married twice. Her last husband, whom she survived, was Everardus Bogardus, a dominic. She had eight children, four by each husband, all of whom, except a daughter, survived her, that daughter leaving two children surviving her. Two of her surviving children subsequently died intestate without issue. Petrus Stuyvesant, Governor of the New Netherlands, July 4, 1654, granted to her by patent 62 acres of land on the Island of Manhattan, which was a confirmation of a previous grant made in 1636 by the then Governor, of which land she died seized and possessed. This land was known as Dominie's Bowery. Bowery was Dutch for a farm, and accompanying buildings. She died in 1663, testate, in the village of Beverwyck in New Netherlands, an early name for the city of Albany, N. Y. By her will she devised this land to her children and the children of her deceased daughter. In 1664 the Dutch surrendered to the British. March 27, 1667, pursuant to a provision in the Articles of Capitulation of August 27, 1664, Richard Nicholls, Governor of the Province of New York, executed a deed to her devisees, confirming their title to this land. It is this property, subsequently coming into the possession of Trinity Church, which was the subject of the representations. At the time of the bringing of John's suit, it was worth in excess of $5,000,000 and the annual income therefrom exceeded $300,000. He brought the suit on his own behalf and no one else. He asserted an ownership of one-fifth of one-sixth, or one-thirtieth, of the Bowery. He claimed this interest by inheritance from his father Cornelius, to whom by descent from his grandfather Cornelius, one of the children and devisees of Anneke Jans, through his father Cornelius, a one-sixth interest

therein had passed. If he had such interest, each of his brothers and sisters had a like one, but for some reason they did not join in the suit. It is possible that they took no stock in it. The representatives of the other five-sixths interest could not have joined therein, because it was based-on the position that Trinity Church and not they owned those interests and he and his brothers and sisters were tenants in common with it. This was made out in this way. In March, 1670–71, what was termed a deed of transport was executed by and for the other five devisees of Anneke Jans to Col. Francis Lovelace, then Governor of the province. This deed was taken in his official capacity and the title to the property conveyed vested in the Duke of York, to whom his brother, Charles the Second, had ceded all the property in America owned or claimed by him. It continued in the latter as Duke and then, as King James the Second, till the English Revolution, by which he was dethroned and exiled; and then with other crown and proprietary land was transmitted to William and Mary and on the death of William the Third to Queene Anne. The Bowery was part of a larger boundary which, including it, was first called the Duke's Farm, then the King's Farm, and then the Queen's Farm. November 23, 1705, Queen Anne granted the Queen's Farm to Trinity Church. The possession of the Bowery was taken by Gov. Lovelace under the deed to him and held by the Duke and Crown until Queen Anne's grant, when the church took possession; and it had held possession ever since, except so far as it sold portions thereof. The plaintiff claimed that such title and possession were as tenant in common with Cornelius Bogardus, who had not joined in the Lovelace deed and those claiming under him. This is a fuller statement as to the passage of the title and possession from Gov. Lovelace to Trinity Church than was set forth in the bill. It merely charged that Trinity Church had entered in possession under the Lovelace deed and Queen Anne's grant. It could not have entered under the Lovelace deed in any other way, and the court, in its opinion, adjudged that it so passed. The church had rented portions of the Bowery and sold portions and plaintiff sought an accounting for one thirtieth thereof. The plea of Trinity Church was that the possession which it took in 1705 under Queen Anne's grant, and thereafter held, was adverse to plaintiff's great grandfather Cornelius and those claiming under him and that hence plaintiff was barred of any interest in the land. A voluminous amount of evidence was introduced on the trial, all of which is set forth in the report thereof in 4 Sand. Ch., so that one can judge for himself as to the correctness of the conclusions reached and the decision rendered. The trial took thirteen days. The report of the case, including the court's opinion, covers in the reprint of the Lawyer's Co-operating Publishing Company forty-seven pages double columns. The opinion of the court covers fifteen of those pages. Note should be taken as to what, if anything, adverse possession had to do with the court's disposition of the case. The Lovelace deed was not limited to the interests of the five devisees by and for whom it was made. It undertook to cover the entire interests therein. The evidence established, and the court so held, that the Duke of York and the Crown had the actual and exclusive possession of the Duke, King, and Queen's Farm, including the Bowery, claiming under that deed from the time of its making until the making of the grant to Trinity Church, i. e. from 1670–71 to 1705, a period of about thirty-five years and that Trinity Church had the actual and exclusive possession thereof, with the exception of the interruption to be referred to later, claiming under Queen Anne's grant from 1705 to the bringing of the suit in 1830, a period of one hundred and twenty-five years. As to the possession under the Lovelace deed, the court said:

"Thus, setting out with the title of Anneke Jans, and the transport of Governor Lovelace, we have the legal presumption, that the Dominie's Bowery was possessed from 1671 to 1705 by the Duke of York, and the sovereigns of England continuously, under a claim of title to the whole of it by deed, exclusive of any other right; and that at the date of the letters patent, Queen Anne was in possession and occupation, and receiving the rents to her own sole use and benefit."

It then proceeded to show that this legal presumption was borne out by the evidence, and concluded thus:

"It is conclusively established that when the farm was granted to Trinity Church, the Queen was in the possession and occupation of the Duke's or Queen's Farm, including the Dominie's Bowery, to her own sole and separate use and benefit. And it is clearly proved, also, that the crown of England claimed to own the farm in fee, solely and exclusively, and not as tenant in common with any person or persons. All the transactions of the government officers concerning it, show an

assertion of title and absolute dominion over the whole property."

As to the possession of Trinity Church under Queen Anne's grant the bill itself asserted, throughout, that possession had been in Trinity Church without interruption from 1705 to the time it was filed. It made no issue whatever on that fact. On the other hand, the defendant took great pains to make out that such was the case. According to the court it presented "an unbroken current of evidence of the highest character" proving such possession. Referring thereto, it said:

"The testimony introduced by the defendants in support of this branch of their defence, was most full, complete, and overwhelming. Its historical interest, and the patient, minute, and almost Herculean labor of its preparation and development, richly merit a far more extended notice than my pressing duty to other suitors in this court, will enable me to bestow upon the subject."

The interruption to Trinity Church's possession was this: After the close of the Revolutionary War in 1783, during the years 1784, 1785 and 1786, plaintiff's father Cornelius and possibly some of the other descendants, under a claim of title to the Bowery, entered on portions thereof. They built a possession house and a fence around it and obtained possession of other portions. They occupied these portions for two or three years, when they were dispossessed by Trinity Church, in part, by violence. This intrusion on its possession came about in this way: A lawyer by the name of Sackett published a book about the title of the descendants to the property in possession of Trinity Church. One of the plaintiff's witnesses is quoted (page 695 of 4 Sandf. Ch.) as saying that upon the publication of the book, "the heirs came down from the country [not unlikely from in and around Albany where Anneke Jans died], said that they would go to law about it, and then the heirs put up this fence." Just what was in the book does not appear. This was the only violence which Trinity Church had exercised in relation to the property and this was to repel and put a stop to an unlawful intrusion on its possession. This interruption to no extent affected the continuity of Trinity Church's possession.

The court in concluding its opinion said:

"And now that I have been enabled to examine it carefully, and with due reflection, I feel bound to say, that a plainer case has never been presented to me as a judge. Were it not for the uncommon magnitude of the claim, the apparent sincerity and zeal of the counsel who supported it, and the fact (of which I have been often admonished, by personal applications on their behalf), that the descendants of Anneke Jans, at this day, are hundreds, if not thousands, in number, I should not have deemed it necessary to deliver a written judgment on deciding the cause."

It continued:

"A hearty dislike to clothing an eleemosynary institution with either great power or extensive patronage, and a settled conviction that the possession by a single religious corporation, of such overgrown estates as the one in controversy, and the analogous instance of the Collegiate Dutch Church, is pernicious to the cause of Christianity have disposed me to give an earnest scrutiny to the defence in this case; as, in the instance of the Dutch Church, they prompted me, in my capacity of counsel, to more zealous efforts to overthrow their title to the lands devised by Jan Haberdinck. But the law on these claims is well settled; and it must be sustained, in favor of religious corporations as well as private individuals."

The Dutch Church Case referred to went to the Supreme Court of the United States and is reported in Harpending v. Reformed Protestant Dutch Church, 16 Pet. 455, 10 L. Ed. 1029. The court said further in conclusion:

"Indeed, it would be monstrous, if, after a possession such as has been proved in this case, for a period of nearly a century and a half, open, notorious, and within sight of the temple of justice; the successive claimants, save one, being men of full age, and the courts open to them all the time (except for seven years of war and revolution); the title to lands were to be litigated successfully, upon a claim which has been suspended for five generations. Few titles in this country would be secure under such an administration of the law; and its adoption would lead to scenes of fraud, corruption, foul injustice, and legal rapine, far worse in their consequences upon the peace, good order, and happiness of society, than external war or domestic insurrection."

To return to the bearing of adverse possession on the disposition of the case, the primary effect was to afford the presumption that Cornelius, Anneke Jans' son, had conveyed or sold his interest in the Bowery to the other five, by and for whom the Lovelace deed was executed, else they would not have undertaken to convey it and he would not

have acquiesced in the conveyance and the possession taken under it. He lived during the entire time that possession was held by the Duke of York and the Crown, dying in 1707, two years after Queen Anne's grant to Trinity Church. If such presumption was not to be indulged, it barred Cornelius from asserting any claim. In so far as the other devisees were concerned, if the Lovelace deed was in any way defective it repaired the defect. So far as the adverse possession of Trinity Church was concerned, it was effective only in case that of the Crown before it was not of sufficient duration to bar any claim on the part of Cornelius or the devisees. If it was of such duration, the Crown had absolute title at the time of the grant to Trinity Church and its possession to no extent affected any Bogardus descendant. Some question was made in the suit as to the validity of that grant. If it was invalid, then the possession of Trinity Church may have perfected its title as against the Crown. But this was of no concern to the Bogardus descendants. Adverse possession, in so far as it was needed to perfect title, was a just, proper, and meritorious defense and was so recognized by the court in that case.

The Descendants' suit, as stated, was brought and disposed of during the pendency of John's. In the bill it is alleged and claimed that the Queen's Farm granted to Trinity Church November 23, 1705, did not include Dominie's Bowery. It lay to the south thereof, its northern boundary being the southern boundary of the Bowery. It was also alleged and claimed that Anneke Jans owned another tract containing 130 acres. Seemingly the claim was that it lay to the north of the Bowery and bounded on it, known as Dominie's Hook, granted to her by Governor Stuyvesant November 26, 1652, which grant was also confirmed by Governor Nicholls March 27, 1767. Queen Anne's grant to Trinity Church of November 23, 1705, was made upon its petition. It artfully presented to the government, in its petition, such a description of the Queen's Farm as left the northern boundary ambiguous. It did so because it had already formed the intention to possess itself of the Bogardus lands to the north, as being part of the Queen's Farm, and had introduced the ambiguity to serve that purpose. This opened the door for pretending that the grant of the Queen's Farm comprehended the Bogardus lands, and it was for the fraudulent purpose of following out such pretension by actual encroachment that it had sought to procure the equivocal grant. It

succeeded in imposing on the government, and its purpose soon after became quite manifest by its conduct. But a small part of the Bogardus lands were improved or inclosed. Prior to the American Revolution it proceeded to act on its original policy of making considerable encroachments. Its course was to take such possession from time to time as it believed would eventually ripen into title. In this way it made a variety of lodgments, though resisted by the Bogardus heirs. It persevered to deprive those heirs of their birthright. Many of them were constrained to abandon their possession by its habitual use of menaces, the frequent use of violence, such as pulling down fences and improvements, burning them riotously, threatening suits and imprisonment, and it occasionally resorted to the temptation of pecuniary offers. It boasted of its wealth and power and declared that it would never desist from its purpose of getting full possession. In this way more timid occupants were induced either to quit their possession or take title under it. Foremost amongst the descendants of Anneke Jans was Cornelius Bogardus, John's father, who had sturdily opposed encroachment. He, notwithstanding the disadvantages under which he labored, kept possession of large portions of the land down to 1785. He was a prominent object for persecution both before and after the American Revolution. His fences were prostrated in the night and burnt by numerous parties acting for the church and who turned in their cattle and devoured his crops. He suffered long and severely and, being poor, was successfully assailed with an offer of $700, in consideration of which he granted and conveyed to the church his interest in the land. He giving way, it was let into the general unrestrained possession of the lands. It was charged that by reason of its taking this deed and being so let into possession it became seized and possessed as tenant in common with them, which relation it continued to occupy until the bringing of the suit inasmuch as no subsequent event or occurrence happened to change in this respect the character of their possession. It appeared, however, from the further allegations of the bill that from 1785 down to its filing, a period of about fifty years, the defendant had claimed the land adversely to the plaintiffs. On demurrer thereto it was dismissed on the ground that by reason thereof plaintiff's claim was barred by the statute of limitations.

The allegations of this bill were without any substantial basis in fact. Indeed, it is

not putting it too strong to say that there was hardly a word of truth in them. As Senator Furman pointed out, in his opinion on the appeal, the bill, on its very first page, placed the village of Beverwyck, where Anneke Jans was living when she died, subsequently the city of Albany, N. Y., on the Island of Manhattan in the city and county of New York. He showed from the description given of Dominie's Hook, the word "Hook" as there used meaning a cape or headland, which turns inward at its extremity, as the Hook of Holland—was not on the Island of Manhattan, but on Long Island, and that according to the description given of Dominie's Bowery it was included in the Queen's Farm, granted to Trinity Church in 1705. In John's suit it was not claimed that the defendant, Trinity Church, had possession of Dominie's Hook and no controversy was presented as to this. On the other hand it was claimed therein that Dominie's Bowery was a part of the Queen's Farm and it appeared from the evidence on the trial thereof that such was the case. No one claimed that it was not.

The statement of the bill as to the possession of the Bogardus descendants and the encroachments of Trinity Church were absolutely false, as shown by the evidence on the subsequent trial of John's suit. It is so full and complete and convincing to the effect that Trinity Church had been in the actual, exclusive, and quiet possession of the Bowery from 1705 to 1830, with the exception of the two or three years' interruption just after the Revolutionary War, when the descendants headed by Cornelius, John's father, seemingly prompted by Lawyer Sackett's book, came down from the north and intruded on its possession which it repelled by violence, that there is no escaping this conclusion.

As to the allegation in the bill that Trinity Church had obtained in 1785 a deed from Cornelius, John's father, by which it had become a tenant in common with the other descendants, this is to be said: No claim was set up in John's suit by Trinity Church that it had obtained such a deed. This, if it had been true, would of itself have defeated the suit and rendered unnecessary the tremendous amount of labor and expense caused by the trial. The fact is that the position taken in the descendants' suit as to this deed was antagonistic to the maintenance of John's suit.

The bill, on its face, contained marks of stretching things to make a case that would stand against a demurrer. It assumed to know what the purpose of Trinity Church had been 130 years before in fixing the northern boundary of the Queen's Farm and charged that it was in order that thereafter it might acquire possession and title to the Bowery from the descendants by encroachment thereon, and that it was in pursuance of such purpose and to effect it that the encroachments therein alleged were thereinafter made. It alleged that the plaintiffs and those under whom they claimed were ignorant of the wrongs complained of until within two years of the filing of the bill, which allegation was directly negatived by their allegation that coeval with defendant's encroachments their predecessors had resisted such encroachments and that the possession was never quiet for a period of twenty years. Referring to the allegations of the bill, Senator Furman, in his opinion, said:

"It must be evident to most persons that this bill has been carefully drawn, not so much with a reference to what can be proved in the case, as to make out a prima facie claim which would compel the defendants to exhibit and set forth their title, deeds and documents and thus enable the complainants to avail themselves of any weak point which they might discover in them from carelessness in the mode of preparing papers at that distant period or from the loss or destruction of some connecting links in the chain of documentary evidence during so many ages as have elapsed since this title was originally granted to these defendants, and it also serves to shade the aspect of that long catalogue of wrongs and grievances elaborated and portrayed in complainant's bill."

Judge Cowen, in his opinion (24 Wend. 587) on the appeal from the decree of dismissal, said that the case presented by the bill was one of "strong moral transgression." Notwithstanding this, he held that the right of recovery was barred by the statute of limitations. He thus expressed himself:

"It [i. e., the Statute of Limitations] is the fixed limit to the remedy; the tempus constitutum. One day beyond is as much too late as one hundred years. This is the peremptory inflexible rule at law, fixed by positive statutes, if there has been adverse possession and no disability or fraud. No plea of poverty, ignorance or mistake can be of any avail. However clear and indisputable the title if the merits could be inquired into, however demonstratively tortious and wrongful the adverse possession, the fact of such possession and the time preclude all investi-

724

gation of the title. The door of justice is closed. The claimant cannot be heard to show his title. It is a decisive answer to him that he comes too late. That alone is the bar. His title remains, but he has lost his remedy."

In thus expressing himself he was referring to the case made by the bill, and not to the case as it actually was. This bill was filed more than ten years and was dismissed more than five years before the trial of John's suit, on which occasion the actual facts of the case were brought out and established and one cannot be far wrong in attributing the "Herculean labor" in the preparation and presentation of the facts by Trinity Church, to which the court referred, in part at least, to a desire to demonstrate the baselessness of the allegations in the descendants' bill and that there was no possible room for any one claiming that Trinity Church had in fact been guilty of a "strong moral transgression" in relation to this real estate. It is inconceivable that, in those days at least, any one, after the decision in John's suit, would have filed a bill containing the allegations in the bill in the descendants' suit.

This extended survey of this litigation has resulted in this. The descendants of Anneke Jans at the time of the making by defendants of such representations as they are charged to have made, assuming them to have been made, had no interest whatever in the property in question and no possible chance to recover same. They have never had such an interest or chance since the beginning of the eighteenth century. In the opening statement to the jury on behalf of appellants, a novel theory was advanced, on the basis of which it was claimed that it was still possible for the descendants to recover the property. In the course thereof, this colloquy took place between the court and their attorney:

"The Court: Disputed at what time? You referred to it as the disputed land. There is no dispute about it since these decisions as to who owns it.

"Mr. McArthur: I will cover that before I finish, your Honor, I do not hesitate to say, your Honor, that there is room for dispute in spite of all these decisions.

"The Court: It is settled. It is res adjudicata.

"Mr. McArthur: I do not agree with your Honor. I think it is not."

Thereupon in justification of this position he said:

"In 1664, the Dutch surrendered to the British, and at that time a treaty was entered into guaranteeing to the Bogardus Descendants and to everybody else that was holding property under the Holland people their right to ownership in the property that they were holding. That is a treaty that is in existence and binding. Some of these people were driven off their land. They were taken and forced to go into Canada. * * * These people went to Canada. They never came back to the United States. They are still Canadians, generation after generation having remained in Canada and the treaty between the Dutch and the British is still the treaty under which they were guaranteed their rights."

This was followed by this colloquy:

"Mr. Watkins: Now, your Honor, I submit that counsel is contending that there is some outstanding claim in connection with this property, as he has already stated, and he is now stating this not as a matter of history, but as contention, and if he is going to make any such contention in this case, he has got to have some proof of it.

"Mr. McArthur: That is only a matter of history.

"The Court: I will say to the jury now that the Bogardus heirs have absolutely no right in that property at all. It is settled and disposed of long, long ago. As a matter of law and a matter of record, they have no right, title or interest at all.

"Mr. McArthur: Your Honor, I desire the record to show that I take an exception to both the remarks of the Court and the remarks of the District Attorney in the presence of the jury.

"The Court: That is well settled. It is a matter of law and a matter of record. They have absolutely no right at all to it, no more show of getting it than going to the moon."

In the course of appellants' counsel's cross-examination of one of appellee's witnesses, he said:

"I submit that if they had any kind of treaty between the Dutch Government and the English Government and if that treaty is in effect today, it takes precedence over the law and is the law today."

This is noticed to bring out that on the trial below it was claimed on behalf of appellants that the descendants still had title to the property and, by the enforcement of the treaty, could recover it. There was nothing in this position. It was no doubt in pursuance to some such provision of the treaty that Governor Nicholls made his deed of confirmation. The treaty itself was subsequent-

ly abrogated by the Dutch in recapturing the colony in 1674. The title under which Trinity Church holds goes back, as has been shown, to the devisees of Anneke Jans themselves. Apart from these considerations, the position was utterly untenable and ridiculously absurd.

2. But not only do these cases and the decisions therein establish beyond possible question that the title to the property was and is in Trinity Church, they also establish beyond such question that Trinity Church had not wronged the descendants in relation thereto, in that it had deprived them thereof without right and that by violence. It has never been open for them to claim that Trinity Church had so wronged them. They, in themselves, not only negative such fact, but one can have no hesitancy in saying that they negative the possible existence of any evidence obtainable from any source to affect their showing in this respect. No such evidence was introduced on the trial below, none was offered to be introduced, nor was the claim put forward that any such evidence was in existence to-day.

3. A very serious consequence followed from the allegations of the bill in the Descendants' suit. Indeed, there is room to say that if that bill had never been filed the occasion for this prosecution would never have arisen. No doubt in that day these allegations were circulated and spread amongst the descendants and deepened, if they did not actually create, the idea in them that they had been grievously wronged by Trinity Church in the manner set forth therein. The statements quoted from Judge Cowen's opinion, applicable only to the case made by the bill, were treated as applicable to the case as it actually was. It was not until more than ten years after its filing that the real truth was brought out and established. They had all that time and Judge Cowen's characterization of the showing made by that lawyer's creation had more than five years to take hold. Seemingly from the statement of the court at the conclusion of its opinion in John's suit that whilst the case was under consideration, it had often been admonished as to the numerousness of the descendants of Anneke Jans by personal applications on their behalf, they took a great interest in the outcome thereof, though it really meant nothing to them. This interest is hard to be accounted for on any other basis than that they had such idea. It is not unlikely that this idea was helped along by the then existing "hearty dislike" and "settled conviction"

against a single religious corporation owning and possessing such an overgrown estate, voiced by the court in that conclusion, and which found expression in the suit against the Dutch Church therein referred to, and later in the suit by the state of New York against Trinity Church, which likewise proved futile. People v. Rector etc., of Trinity Church, 30 Barb. (N. Y.) 537; People v. Rector, etc., of Trinity Church, 22 N. Y. 44. Space forbids mentioning the basis of this suit. Suffice it to say that it was not, as stated by appellants' counsel in his opening statement to the jury, that Trinity Church had merely seized the property. This notion, as the evidence on the trial below made clear, trickled down through the intervening years to the descendants of the present generation and has become widespread amongst them. It has become a family tradition. Several features of that tradition may be noted. The descendants had been thus wronged by Trinity Church. This was expressed by appellants' witnesses in various ways. Trinity Church had gotten the property illegally. It had unjustly treated the descendants. It had defrauded them of their property. It had done and cheated them out of same. It had robbed them of it. It had driven them from it. It had stoned and clubbed them off of it. The suits in the New York courts had been wrongly decided. This was accounted for by asserting that the judges thereof were Episcopalians. One of appellants' witnesses put it this way. The jury and judges and the whole thing came out of Trinity Church. Those courts, even though they had decided against the descendants, conceded that by right, i. e., meritoriously, the property was theirs and the trouble was only with the remedy. That was barred by the statute of limitations. The source of this was the expressions quoted from Judge Cowen's opinion. That the tradition had this feature shows that its source was the allegations made in the bill in the descendants' suit. Another feature of it leads to the same conclusion. It was that there were 192 acres and not 62 acres, involved, i. e., the controversy included Dominie's Hook containing 130 acres as well as Dominie's Bowery containing 62 acres. This feature of the tradition could come from no where else. In connection with this tradition the idea was more or less prevalent amongst them that there was still a chance to recover the property. According to appellants' witnesses the descendants had been ridiculed, laughed at, scorned, and held in contempt because of this tradition. They looked upon Anneke Jans as an "illustrious lady" and they

were proud of their heritage. They felt this treatment of themselves keenly. One of appellants' witnesses stated that it would give her "a very great thrill" to be shown that their ancestors had been defrauded out of their property. All this made them capable of being easily duped, and this fact, in connection with their numerousness, made them an attractive field for the swindler. The court in the conclusion of its opinion in John's suit stated that at that time the descendants were "hundreds if not thousands in number." How many more must there be at this day, over seventy-five years afterwards?

4. The appellant Gridley, at the time he came on the scene, lived in New York City and was engaged in and connected with the manufacture of fire extinguishers, and appellant Wright was his confidential secretary. She actively participated in everything which he did that gave rise to this prosecution, and it is not necessary to make any further reference to her. He had been a lawyer but had been disbarred October 26, 1917. In January 1912, one Fonda, and a lawyer named Good, were indicted in the federal court for New York City for the fraudulent use of the mails in soliciting and receiving contributions from the descendants on the ground that they were entitled to recover the property in question from Trinity Church. Gridley had been retained by Fonda in connection with the investigation of the claims of the descendants and, according to his statements to them, was appointed by the court to defend Fonda in this prosecution. The prosecution resulted in an acquittal of the defendants because of lack of fraudulent intent. Thereafter Gridley solicited subscriptions indiscriminately from the descendants towards defraying his expenses of the alleged investigation made and to be made by him as to the validity of the title to the property. Disciplinary proceedings were thereupon instituted against him by the Association of the Bar of the City of New York, which resulted in his disbarment on the ground that he had no chance of success and had no new information and was unable to advance any theory upon which probable success could be based. The appellant Wright was his confidential secretary at that time. Matter of Gridley, 179 App. Div. 621, 167 N. Y. S. 107.

5. In the summer of 1922, a movement started amongst the descendants, mainly if not exclusively, living in Pennsylvania and Michigan, to see if there was a possibility of recovering the property from Trinity Church and if there was to bring suit to that end. Possibly the matter had been brewing for some time and that in other states. Local associations of descendants, if not already in existence, were organized and possibly state associations also. On December 8, 1922, at Wilkesbarre, Pa., a national association was organized. Gridley had nothing to do with inaugurating this movement or the organization of these associations. They had heard of him and concluded that he was the best man to get to look after the matter for them. They approached him to this end before the organization of the national association. According to appellants' witnesses, he at first refused to have anything to do with it, but finally consented. There was a difference in the testimony as to what he was employed to do. As he was a disbarred attorney, which they knew, he could not represent the descendants in court. According to appellee's witnesses he was employed to prepare their case for presentation in court. He claimed that from his previous connection with the Fonda and his own case he had access to legal data and evidence that would make a case and suggested that he might be reinstated so that he could handle the case in court. He was to be paid a salary of $500 a month for his services and was to be provided with funds to enable him to procure documents and otherwise prepare the case. The local associations required of their members a $5 initiation fee and $2 a month in dues. He guaranteed that he would have the case prepared in six months so that an attorney could present it to the courts of New York, fixing $10,-000 as the amount of money necessary for the work. He said that there was no doubt about their winning. According to appellants' witnesses there was no such employment, no suit was in contemplation, and he never led them to believe that the property could be recovered. He was employed to prepare and publish a pamphlet of 60, probably 160, pages giving a history of the matter and the descendants' side of it, backing it up with certified copies of documents so as to create public sentiment in their favor. The monthly payment of $500 was not for salary, but for what he called overhead, such as office rent, stenographer's salary, and so forth. Whatever may be the truth as to this, after several monthly payments had been made and funds had been furnished, the national officers insisted that he submit his data and material to a leading Detroit lawyer for his opinion as to the possibility of recovering the property. This he declined to do. The national officers were concerned solely as

to such possibility, and thereafter about the middle of October the national association disbanded. Shortly thereafter Gridley came into contact with members of the local associations—it cannot be said for certain whether he or they brought this about—and as a result thereof an understanding was had to the effect that he was to work direct with the locals. The descendants were to be organized into local associations from coast to coast. He was to prepare and publish for them a book of about 480 pages, the contents and purposes of which will be stated later. Upon the publication of the book, and not until then, a new national association was to be organized, at which time also his connection with them was to cease. The name chosen for them was "Advocates of Justice for the Descendants of Anneke Jans Bogardus." Possibly these associations were to have in part a social aspect, but their main purpose was to raise funds for the preparation and publication of this book. The idea of publication of such a book came from Gridley. It is tempting to infer that the idea came to him from Lawyer Sackett's book of the last half of the eighteenth century. He insisted at the outset that he be furnished in ninety days with $15,000 for this purpose, to be raised by 1,000 members paying $15 in advance for a copy of the book. Steps were taken at once to carry out the understanding thus come to. The effort to raise the $15,000 in this way failed. A loan was then sought from the members to supply the deficiency. By February 2, 1925, this amount of money was thus raised. On that date Gridley appeared before a large gathering of the descendants in Detroit and stated that a book of 480 pages was not large enough to contain all the essential material. To have the last word on the subject it would take one of 1,000 to 1,500 pages. This enlargement was then unanimously determined upon. To make it would require more money, to raise which each member would have to subscribe $25 for a book and the membership fee was fixed at $25. Of the $25 so subscribed $10 was to pay the cost of the book, $5 to repay the loan, and $10 to the new national association when formed. The effort to raise this additional money was then begun and was continued from that time for a period of over three years, i. e., until just before or about the time of the finding of the indictment on March 2, 1928. At the start the program was for each subscriber to the 480-page book to sell a book to three, each of the three to three, and so on for seven or eight trips, making 728,000 books in all. After the larger book was determined on, this program was abandoned and the goal fixed at 100,000 books. Many joined the association, who were not descendants, from an investment point of view.

From November 1, 1923, until the end Gridley was actively engaged in organizing descendants and securing subscriptions. He attended meetings of the descendants at various places, as many as 800 or 1,000 being at some of them and the room where the gatherings were had oftentimes being filled to overflowing, addressed them, and urged them on in their efforts. This he did more after February 2, 1925, than before. In the spring of 1926 several of the descendants were designated to and did enter upon what was termed a crusade throughout the country to organize and increase memberships and subscriptions. At the same time Gridley became a crusader himself. He attended meetings at various points in Michigan, Milwaukee, Chicago, and in the West, going as far west as Los Angeles, Cal., and was on this crusade for a good part of the year. All subscriptions were paid to local treasurers and by them transmitted to Gridley, who was under no bond to account for same. Up to August 23, 1923, there was paid to him by the national association then in existence $6,135. From August 1, 1924, to November 1, 1925, there was paid to him $28,121.84. How much was received by him between August 23, 1923, and August 1, 1924, and after November 1, 1925, did not appear. He claimed that during all this time $500 per month of the money received was applied to payment of overhead. The understanding was that when the new national association was formed after the publication of the book it was to undertake the sale thereof to the public generally as well as to descendants and of the proceeds of the sale he was to receive 15 per cent. and the National Association 85 per cent.

Each member of the local associations was required to answer and sign a questionnaire prepared and put out by Gridley containing 39 questions. The answers called for were largely acknowledgments on the part of the signer of a number of things. Note may be taken of these:

(1) That the then work and plans of the association were confined solely to the publication of a book; that the publication thereof was at the request of the descendants; that they had sought Gridley out to procure and secure the benefit of his five years' connection with the matter; that he finally consented to publish in book form, for public sale and their purchase, the results of his in-

vestigation work in connection with the matter; that it might take an attorney years to make the investigation and collect the records and go over the 280 odd years of history in the matter; but that by securing his services any expense incident to an independent investigation would be eliminated.

(2) That it was time that the descendants became informed of the facts and proofs in regard to the matter and should learn what the records showed before doing anything further; that an injustice had been done the descendants by Trinity Church; and that they had a cause against and a side opposed to that institution.

(3) That Gridley was a disbarred attorney; that he was disbarred as a consequence of his connection with the Bogardus matter; and that therefore he could not perform any duties which an attorney was legally authorized to perform without incriminating himself.

(4) That Gridley had in the past championed the descendants' side of the controversy with Trinity Church; that he was the only man who had stood up and really fought for their side of the matter in the last fifty years and thoroughly believed in the injustice done them; and that he was entitled to a reward for his fearless championship of their cause and to the unqualified support, moral and financial, of every descendant.

(5) That the sale of the book would secure public opinion on their side; and that in order to such sale it was necessary to have a national organization, which would represent every section.

(6) That it was insisted that they forget suits and settlements and the like, pending the publication of the book for Gridley's protection.

In this questionnaire there was no acknowledgment called for to the effect that the descendants did not then have a present interest in the property which might be asserted by suit. The forgetting of suits was only pending the publication of the book and for Gridley's protection. At the end of the questions it was stated that they were put to satisfy Gridley that they had a live fighting organization. According to appellant's witnesses, at all meetings addressed by Gridley he told those present to forget about lawsuits. It was a matter which he emphasized. It might involve him in trouble and result in the collapse of the whole movement.

On the back of the written subscription for the book was this statement: ..

"The interested parties do not want the facts contained in the W. T. Gridley book to be used for the purpose of bringing suit. Therefore, we, the Descendants of Anneke Jans Bogardus appeal to you to keep the contents of this book within the confines of your immediate household for the space of one year or until the plans of our organization have been fulfilled."

According to appellant's witnesses, Gridley in his addresses insisted on this requirement also. His explanation thereof was that it was to prevent the contents of the book being used as the basis of bringing a suit against Trinity Church by any descendant or groups of descendants who might be disposed to bring one before the national association could be formed. The implication of this was that they could be used for such purpose. Such indeed was the implication of the statement on the back of the subscription to the effect that the interested parties did not want the facts contained in it used for such purpose. It could be so used, but they did not want it so used. After the national association was formed, the book was to be submitted to a group of lawyers for their opinions, not as to whether a suit should be brought, but as to the correctness of the positions taken. It would help the sale of the book if it could be so indorsed. There was no understanding as to what the national association would do with the proceeds of the sale of the book. That was a matter left entirely to it. Gridley never mentioned when the book would be published. No time was specified therefor. Its preparation, he said, might take a long time. Some of the descendants at Milwaukee and Chicago and on the Pacific Coast broke away from the organization and attempted to set up a rival one, because of the position taken as to bringing suit. They desired that steps be taken to that end.

6. The use of the mails which constituted the gravamen of the offense charged occurred in December, 1925, and January and February, 1926. It was essential to establish that the scheme to defraud charged in the indictment was then in existence. It was not sufficient that such a scheme may have been in existence during the time that the national association operated if it was abandoned upon its being disbanded. There was evidence, as has been stated, that the program then was that Gridley should prepare the case for presentation to the court and possibly to seek reinstatement in order that he might make the presentation. Whatever may be the truth

as to this, it is certain that upon the disbandment of the national association this program was abandoned and it constituted no part of the program subsequently adopted and adhered to. Thereafter the program, so far as Gridley's efforts were concerned, was confined to the preparation and publication of a book, at which time his services were to cease. He was to have no part in the bringing of a lawsuit or preparing a case for presentation to the court save in so far as the preparation and publication of the book itself might be such. The questionnaire called for forgetting suits and settlements and the like pending the publication of the book, and the written subscription for the book called for keeping its contents within the confines of the subscriber's immediate household for one year after its publication. Gridley, in his talks to the descendants, as heretofore stated, insisted on both these things. He may have been led to take this position because the bringing of a lawsuit would at once puncture the scheme which he then had, and the requirement that the contents of the book be kept secret for a year during which time the national association could be organized and get in action would be taken as a hint that such contents might at least justify a suit without a direct assertion to that effect. But, however this may have been, there can be no question that the program in effect and being carried out at the time of the use of the mails charged was as stated. That such was the case, that Gridley had nothing to do with inaugurating the movement, and that the indictment did not charge false representation as to the preparation and publication of a book, may be taken to have been the sole defense set up by appellants on the trial below. It was claimed on their behalf that by reason thereof they were entitled to a verdict of acquittal. But it did not so entitle them. The question still remained: What, if any, representations were made to induce subscriptions to the book and payment thereof? If representations were made that Gridley possessed and had access to information and evidence of the character charged in the indictment, which representations must have been knowingly false, and made with fraudulent intent, then the scheme charged in the indictment, to effect which the mails were used, was made out. In that case the preparation and publication of the book was not the end had in view. It was to furnish by the book such information and evidence. The book was a means to that end. The important thing was what, if any, representations were made as to the contents of the book and the

end which they would serve, to induce subscriptions and payment thereof.

7. Concerning such representations there was a contrariety in the evidence. The questionnaire, the statement on the back of the written subscription for the book, and the part of the program which called for the organization of a national association after the publication of the book, when Gridley's connection with the matter would cease, which association was to get the opinion of lawyers as to the case made by the book, was calculated to cause the descendants to infer that the contents of the book would be such as to make a case at least of possible title to the property and recovery of same in court. To the same effect was a statement in a letter which he wrote to the national officers severing his connection with the national association because they insisted on his submitting his evidence and proofs to the Detroit lawyer, which was as follows:

"I have told you and I now reiterate it, I cannot be a party to the bringing of a premature suit; for I hold the opinion that there is no one man in the United States today who, without public opinion back of him, could get any consideration in this matter; it is my candid opinion that any such move would retard your work for at least five years, if it did not kill it for all time."

What he was objecting to was not to being a party to the bringing of a suit, but to the bringing of one prematurely.

Then in the opening statement in the course of the trial, as has been shown, it was asserted that there was a possibility of recovering the property on the basis of the treaty between Great Britain and Holland. Appellees' witnesses testified that Gridley stated that by the evidence or the things that he had that would go into the book, they could establish their ownership of the property, the right of the descendants, that is, the right of all of them; that the evidence that would be in the book would be proof enough to take up on trial by any lawyer that they would want to have try the case; that the book was to contain the different legal documents so that they would be able to establish themselves as heirs of the property; that the book would contain facts necessary to present to a court, so that they could, after the book was published and in their possession, go ahead and bring suit against Trinity Church and recover the property; that there would be legal documents in the book and any jackknife lawyer, four-cornered, could take the book, put it into court, and win the case; that the

book would contain all the proofs necessary for them to regain the property and would assure their getting it; that the proofs would be so conclusive that any attorney would fight the case; that he would get the articles and deeds that would give them their rights to the property and could show them that they were heirs to the property; that it would take him a long time to establish this and he would like to put it in book form to establish public opinion, and as they would get the public opinion of the people all over the United States it would help to clear their title and establish in the minds of the public that they were the rightful heirs to the property; and that through public opinion the trial by which property could be gained by them could be carried on by any attorney through the information in the book. According to one of appellee's witnesses, Gridley, on one occasion, advanced the same idea put forward by his attorney in the opening statement on his behalf on which the property could still be recovered notwithstanding the statute of limitations. He said to her that the running of the statute of limitations against them would be the hardest thing they would have to contend with, but that there was a way of overcoming it if there was a descendant who was either a subject to Holland or Great Britain, and upon her saying that they had descendants in Canada he said that would be just the thing, in that it would make England force the United States to fulfill the treaty to protect the subjects of that country to recover what belonged to them. The statute of limitations he said could be defeated by having a foreign heir. That Gridley made such statement is credited by what his attorney said in his opening statement.

On the other hand, appellants' witnesses testified that Gridley said that the descendants had no remedy by which they could recover the property; that if any of them had an idea that they could recover the property, they had better get it out of their heads immediately; that the property could not be obtained; that they could not get around the statute of limitations; that he hoped that they did not think he was fool enough to lead them into any more litigation, there had been enough in the past, and he would not lead them to believe that by putting money into the proposition they could get any property; that they should get out of their heads that he had ever promised that through the book they could get part or parcel of the property; that he never said anything about obtaining the property as the result of this publication of the book; that he never said that the descendants would be able to obtain the property through the book as they would not be so able; that he never said, as testified by two of appellee's witnesses, that any jack-knife lawyer could take the data and evidence contained in the book and recover the property; and that such data and evidence would show that the property had passed out of them.

The result of this conflict in the evidence was that it could not be said that it had to be accepted as beyond reasonable doubt that Gridley had made the representation charged in the indictment.

8. But, according to appellants' witnesses, Gridley did make statements as to the contents of the book and the purpose which they would subserve. All of them who were descendants had something to say on this subject, and they practically agreed. In the main the book would contain what he had ascertained during his five years' experience in defending Fonda and himself. It would deal with some general matters in the nature of history. The historical features would cover a number of matters—Anneke Jans, the family, Manhattan Island, the property, the controversies concerning same. But what it would principally contain would be facts and data backed up by certified copies of documents and maps which would establish beyond question that Trinity Church had wrongfully deprived the descendants of the property and that from a moral point of view it was rightfully theirs, or in other words authentic and complete proofs to this effect. The purpose of the publication of the book was to settle once and for all the dispute and to create public opinion against Trinity Church and in favor of the descendants. It was such public opinion which he stressed more than anything else. Mention was made of it as we have seen in the questionnaire. According to these witnesses, Gridley said that public opinion was the greatest factor in everything pertaining to any sort of injustice in the world; that the descendants' case was to be tried before the bar of public opinion; that the book would enlist public opinion on their side; that they were going to get redress through public opinion; that the public would be shown that they were in the right; that the dispute was to be settled in the open before the public in the form of a book, so it could be read for itself the way these transactions had been carried on without regard to Episcopalian judges; that the

book would bring them public opinion without which nothing had ever been done; that it would enlighten the public as to various things that had transpired these many years; that if they could get the facts before the public they would alter the opinion of the public in regard to the Bogardus family; that by bringing out the facts fairly backed up by records and proofs public opinion would be altered; that the book was for public opinion to establish their side of the case; that giving the truth to the public in regard to the matter would create public opinion which would be a large percentage of their fight, and show that the claim they made was true and just and that Trinity Church did not own the property; and that public opinion would be more than all the lawyers in the world and let the Christian world know and understand their side of the story which it never had. Appellants' attorney in his opening statement to the jury said:

"We will show you that Trinity Church each time took the defensive and defended every case on the theory, as it has been suggested here repeatedly, that they had held the property so long that the remedy was gone. They did not dispute many of these volumes that are going to be used as exhibits in this case, and we will show you conclusively from these volumes that will be introduced as evidence in this case, that in no instance in a single one of those cases, did the Trinity Church ever state that they came lawfully by that property. They admit the charges in every case, but take advantage of their own wrong in every case. The Judge's entire decision in one of these volumes points that out in unmistakable language."

He said further:

"These people, as I say, were driven off this land. It is one of the things that is the tradition of this family. It is one of the things that you have heard from the witness stand, these stories that these people have been hearing from the time of their infancy, generation after generation. They feel the injustice of those things."

And he said further:

"We will show you that they (i. e., the defendants) were seeking to create public opinion with the good faith and the thought that this public opinion sentiment would be created in this country to require a Church corporation to recognize that they had done a wrong in acquiring this property."

The movement itself, fostered and furthered by Gridley, was a representation, in and of itself, at least to the effect that the descendants from a moral point of view were entitled to the property. The name chosen for the Association, to wit, "Advocates of Justice for the Descendants of Anneke Jans Bogardus," meant this at least. The questionnaire recited that an injustice had been done the descendants by Trinity Church and expressed the idea that they had a side and cause against that Institution. According to it, Gridley was a fighter and its object was to satisfy him that he had a fighting organization behind him. It breathed fighting of some sort all through it.

The book, whatever of general matter it would contain, was to be in the main an attack on Trinity Church; that was its raison d'etre. It was because of this, and because of it only, that Gridley was enabled to put over his program to the extent that he did.

9. The representation that he had authentic proofs or any data or evidence tending to show that the descendants had the moral right to the property and that their case could be so won was absolutely false. The evidence presented on the trial of John's suit, reported in 4 Sandf. Ch., and the decision of the court in that case, established beyond question that the descendants did not have such right to the property. They go further and negative the possibility of there being in existence any evidence not presented on that trial to this effect or tending to show to the slightest extent that such was the case. No such evidence or proofs were presented by appellants at the trial, and none were referred to in the opening statement to the jury on their behalf. The only thing referred to therein as bearing on the rights of the descendants was to the effect that possibly at least the property could be recovered through the intervention of the governments of Holland or Great Britain, a perfectly absurd idea. No evidence was introduced tending to show that Gridley had in his possession or access to any such evidence or proofs. It was testified that, at the meeting in Detroit on February 2, 1925, when it was determined that the book to be published should be enlarged, he talked extensively as to material which he had collected for use in the book and which was in New York and exhibited blueprints of certain of such material, which he did to convince that a larger book was necessary, but no such material or blue prints were introduced in evidence. In the opening statement to the jury on behalf of appellants, it was said that they were able to and would produce before the jury thirty-six packing cases

732

filled with books showing the greatest amount of preparation, but no such packing cases or books were introduced in evidence. Two witnesses were asked to testify as to their having, after the finding of the indictment, brought certain material to Detroit from New York by truck and certain other witnesses as to their having seen such material, but the court refused to allow them to so testify and properly so. The material should have been produced in court and identified by them so that the nature of the material and its effect could have been known. Five book sellers from New York testified as to their having sold appellants books during the period covered by the movement. One testified that Gridley bought from him a collection of old law books, some relating to ecclesiastical law and English statutes of the seventeenth and eighteenth centuries and some colonial laws, and a sort of general collection of books and law magazines; that he must have sold him 1,000 books; and that he paid him approximately $1,200 for them. Another testified that he sold appellant Wright a set of Valentine's Manual of the City of New York, a complete set from 1841 to 1870, for $500, and that he sold her a great many other books pertaining to New York City, books on New York in all its branches, history, biography, genealogy, history of towns and cities, and a number of reference books, such as a dictionary or encyclopedia, all of which cost from $250 to $350. Another testified that he sold appellants books on colonial history, genealogy of families, and early New York historical matter, including particularly Savage's Genealogical Dictionary, for $50 or $75; and that they had bought from his firm at least twenty times in the past five years and paid them, from $25 to $50, at least $2,500 for what they bought. Another testified that he had sold appellant Gridley books relating to historical research, local history and genealogy, and one shipment of books from England, and that he had paid him about $1,000 for the books so sold. Another testified that he had sold appellant books and maps or prints, the books pertaining to the history of New York City and State and genealogical matters; they were old records and histories of past generations; that he had sold them hundreds of books; and that he recalled particularly that he sold them the original Pen & Ink Assessment Record for about 1800 covering lower Broadway, New York City.

In Gridley's report of receipts and expenditures between August 1, 1924, and November 1, 1925, he took credit for $11,017.81 for maps, special services, records, books, etc. But none of these books or material were introduced in evidence so that it could be determined just what bearing they had. The most that can be said for this evidence is that it indicated that Gridley was preparing to publish a book covering the general matters referred to in his representations. There is no possible basis for thinking that any of this material contained anything tending to show that the descendants had the moral right, much less the legal right, to the property in question. There was no evidence that Gridley had ever written a line for such a book. Neither appellant took the stand, though it was said in the opening statement to the jury on their behalf that Gridley would. This may account for the absence of such evidence. The question as to whether Gridley intended in good faith to publish a book for the descendants was not a primary one in the case. The false representation charged was not of intention to publish a book, and they could not be convicted for such representation under the indictment.

10. It must be taken as a matter beyond reasonable doubt that the appellants knew that the representation which they made according to their witnesses was false and that they made it with fraudulent intent. It was obviously without foundation. It could not have proceeded from honest ignorance or delusion. There was nothing introduced in the evidence to justify the position that it did and it was not claimed on behalf of appellants that such was the case. The allegations in the bill in the descendants' suit and Judge Cowen's expressions were not a foundation for such a representation. Those allegations were a mere claim and those expressions were based on the truth of that claim. This claim was subsequently shown in John's suit to be baseless. No doubt the tradition of the descendants to this effect was a delusion, but appellants' previous connection with the matter and familiarity with what had gone before precluded their being deluded or having acted through ignorance. According to their own showing, therefore, appellants had for a period of four years at least, prior to the finding of the indictment, falsely and with fraudulent intent represented that they possessed and had access to information and evidence which would establish at least that Trinity Church had wrongfully deprived the descendants of their property and that morally same was rightfully theirs and that the publication of same would convince the pub-

lic that such was the case, or, in other words, that such information and evidence would enable them to win their case at the bar of public opinion. By reason thereof they obtained from the descendants a large sum of money. Beyond all question they were thus engaged in putting over a colossal humbug to enrich themselves at the expense of their dupes and with no concern for the gross wrong they were doing Trinity Church. The only question open was whether they had gone further in their representations and stated that such information and evidence would establish that the descendants had the legal title to the property and could recover it in court.

11. Usually the question of variance in a criminal case arises when the evidence for the prosecution does not agree in some particular with the allegations of the indictment. It does not so arise here. Possibly the representations testified to by some of appellee's witnesses came short of being that the information and evidence which the appellants had would "conclusively" establish the descendants' legal right. Some of it may not have gone farther than that it would establish a possibility of recovery. Such a variance was not material. The question of variance here arises between the allegations of the indictment and the case made by appellants' evidence. According to the one the representations made were that the descendants had the legal right; whereas, according to the other, they were that they had the moral right. Was this variance material? Were appellants subject to conviction for using the mails to effect the scheme to defraud made out by their own evidence?

Harrison v. United States (C. C. A.) 200 F. 662, 673, stated the tests as to whether a variance between the indictment and evidence is fatal thus:

"Upon the question of variance between indictment and proofs, the controlling consideration should be whether the charge was fairly and fully enough stated to apprise defendant of what he must meet, and to protect him against another prosecution, and whether those particulars in which the proof may differ in form from the charge support the conclusion that respondent could have been misled to his injury."

The matter is more succinctly put in the case of Mathews v. United States (C. C. A.) 15 F.(2d) 139, 142, where this test was approved. The matter was thus put:

"Tests of fatal variance are: Was defendant misled? Will defendant be protected against a future proceeding?"

As the evidence came from appellants, they can hardly be said to have been misled thereby. Further, it is to be noted that the indictment first charged in general terms a scheme to obtain money by means of false and fraudulent representations, which was broad enough to cover any such representation, and the subsequent charge as to the specific representation was only by way of identifying the representation so generally charged. The substantial thing charged was the scheme to obtain money by falsely pretending to have information important and valuable to the descendants in relation to the particular property referred to, and it would seem that the exact aspect in which it would be valuable to them would not be of the essence of the scheme, and so, in a broad way, that the scheme so established by appellants' evidence would be the scheme alleged. It is, however, not necessary that we determine the question, in view of the fact that there was ample evidence introduced by appellee to establish the scheme specifically charged in the indictment and, as will later appear, we hold no error was committed by the lower court. Had we held that error had been committed, it would have been important to determine this question in determining whether such error was harmful to appellants.

12. There remains for presentation the climate of the trial. It is given as it is to be gathered from the record. Before any steps were taken looking to the prosecution of the appellants for their connection with this matter, they had succeeded in worming themselves into the absolute confidence of most of the descendants, particularly so of those who were Michiganders, of whom there seem to have been as many as 1,500. Michigan was the "most fruitful spot" in the United States for their efforts. One of the Michiganders is quoted in the evidence as having said that he had more confidence in Gridley than he had in Almighty God. Appellant Wright's co-appellant in No. 5569 said, on the occasion hereafter referred to, that such appellant had been a "very dear friend to her" or "the best friend she ever had" and "just like a mother."

The Post Office Department began its investigation the latter part of 1926 and kept it up until the finding of the indictment March 2, 1928. When the Michiganders heard of this, they rallied to appellants' support. In April, 1927, they caused appellants to come to Michigan to remain there until the storm was over, in order that they might protect them. They provided for their support and defense. The leading trial lawyer,

734

from whose opening statement to the jury quotations have been made, was a Michigan Bogardus. They attempted, to a certain extent, to thwart the investigation by the Post Office Department and then the finding of the indictment by the grand jury. When the case came on for trial and during its continuance, they packed the courtroom—not merely the space allotted to spectators, but crowded inside the rail and stood around the bench. A newspaper reporter, in touch with them, took note of the fact that they were "stirred to fever heat." Their presence was not only from a natural interest in the case, but to make apparent to the court and to the jury that those whom the prosecution claimed had been defrauded by appellants were on their side. Mrs. Roen, above quoted, a married woman from Lansing, with three small children, "babies" she called them, was the constant companion of appellant Wright during the course of the trial. At the outset and until the occasion on which she made the above-quoted remark, she sat in the front row inside the rail whispering, smiling, and casting her eyes around. Others inside the rail likewise cast knowing glances at the jury. Arrayed on the appellants' side was a man who had been sentenced by the court to the penitentiary for conspiracy to violate the National Prohibition Law and who, according to the information of the court, had the reputation of being a jury fixer and a blackmailer. He sat on appellants' side during the trial and when the court was not in session was to be found in the corridor. He had prepared the affidavits used on the motions to quash hereafter referred to. What other part he took did not appear. On the first day of the trial whilst the second witness for the prosecution was testifying as to what appellant Gridley had said at the time of his employment by the national association in regard to a certain witness who had testified against him in the disbarment proceeding, he advanced toward the witness with his arm and hand outstretched and said, "You are a damn liar." This conduct was the subject of the contempt proceeding involved in No. 5568. On the next day, at the noon recess, in the manner more fully brought out later, appellant Wright and Mrs. Roen came across two of the women jurors in the washing room of the hotel at which they, the appellants, were staying. Thinking, perhaps, that the jurors were talking about the case, appellant Wright told them who she was. Mrs. Roen then said that she did not know whether it would be proper but she would like to introduce them to Mrs. Wright and then made the statement

about her above quoted. Thereupon appellant Wright said, "Whether we are introduced or not we want you to know that we have a very intelligent jury." The women jurors reported the occurrence to the court and a hearing was had in chambers. Because of this occurrence Mrs. Roen and the other descendants were required thereafter to stay outside the rail. This conduct was the subject of the contempt proceedings in No. 5569. The newspapers the next day gave an account of the hearing. Because of this appellants made a motion for an order declaring a mistrial. At the same time appellant Gridley made such a motion on the ground of appellant Wright's misbehavior and appellant Wright made a similar motion on the ground of appellant Gridley's misbehavior, all of which motions were overruled. Thereafter things ran more smoothly. But, at some time in the course of the trial, it was reported to the court that a descendant, who had been assisting appellants in their work and had come all the way from California to testify for them, had attempted to influence a juror; but no investigation was had as to this. It was stated emphatically in the opening statement that the appellant Gridley was going to take the witness stand. The court inquired as to whether the manuscript of the proposed book had been prepared and was going to be produced, and, upon its being stated that some manuscript had been prepared and was there but not in court, it asked that all the manuscript be produced. Thereafter it was determined that appellant Gridley should not take the stand and such manuscript as had been prepared should be destroyed. Thereupon some 40 or 50 of the descendants gathered at the suite of rooms in the hotel occupied by appellants and consigned the manuscript to the flames. Somewhere in the record there is an intimation that there was fainting during the argument.

The sole defense put up by appellants was that the descendants had sought them out and that they had been engaged in a "legitimate book publishing proposition" and were to have nothing to do with a law suit. This was a sham. That the descendants sought them out did not relieve them of responsibility for taking advantage of their gullibility to swindle them. And it did not follow from the fact that their efforts were to be and were confined to the preparation and publishing of a book that they were not guilty of having devised a scheme to defraud the descendants. This all depended upon the nature of the representations which they made to induce the descendants to subscribe and pay for the book

which they were to prepare and publish. The testimony on both sides agreed that they did make false and fraudulent representations to put the book over and that the measure of success with which they met was due thereto. They differed only as to the nature of the representations. Appellants' witnesses testified to the making of the representations testified to by them as if they were considered by them to be the gospel truth and were in blissful ignorance of the fact that, according to their own testimony, they had been the victims of a downright swindle on the part of appellants. They were blinded by pride and a feeling that Trinity Church was behind the prosecution in order, if not to keep from having to disgorge, to prevent its gross wrongdoing, as they viewed it, being spread before the Christian world.

### Assignment of Errors.

■ 1. The first error complained of is not any specific ruling. It is the court's attitude towards appellants. It is claimed that it was unfair, hostile, and highly prejudicial to them and that by reason thereof they were denied a fair trial. This is put in the forefront and greatly stressed. Strong expressions are used in characterizing the trial. It is said that it "actually became nothing but a third-degree examination"; that it "resembled a proceeding of the Spanish Inquisitors or some other method of the Dark Ages"; that it "was carried out upon the theory that a conviction must be obtained"; and that it was "a travesty upon justice." The decision in the case of Sunderland v. United States (C. C. A.) 19 F.(2d) 202, is cited as favoring a reversal on this ground. Because of the stress placed on this alleged error and these strong expressions, the manifestations of adverse attitude relied on will be considered in detail. They are presented under four headings:

■■ (1) Rulings on the evidence: No particular ruling is complained of as a ruling. Certain features only of the rulings are relied on. There is some intimation that such attitude was shown by the great number of rulings against the appellants. It is said that there was a "constant overruling" of their counsel. Whether this was a manifestation of adverse attitude towards appellants depends on whether the rulings were proper. If appellants were constantly making objections not well taken, many of which were frivolous, as was the case, this accounts for the constant overruling. But the particular feature of the rulings relied on as showing partiality is rulings in favor of the prosecution and against the appellants on substantially the same ques-

tions and answers. The mere fact that the rulings were opposite is all that is relied on. The instances cited are these. One witness for the appellee was allowed to testify, over appellants' objection, as to the substance of what Gridley had said on a certain occasion and four of its witnesses were allowed to testify as to why they bought the book that Gridley was to prepare and publish. On the other hand, one of appellants' witnesses was not allowed to testify as to what his understanding was about what was to be in the book and another as to why he joined the organization. There was no inconsistency whatever here. The questions asked appellee's witnesses were proper and the objections thereto frivolous. This is apparent as to the first one. In answer to the other one, each of the four witnesses testified that he bought the book because of Gridley's representation that it would contain evidence that the descendants were entitled to the property, to the making of which representations they had already testified. That is what induced them to buy. Though it was not incumbent on the appellee to establish that the scheme charged was successful, evidence as to its success was not inadmissible. Rumble v. United States (C. C. A.) 143 F. 772; Bettman v. United States (C. C. A.) 224 F. 819. On the other hand, the questions which appellant's witnesses were not allowed to answer were not only not substantially the same as asked appellee's witnesses, they were improper and the objections thereto were rightfully sustained. Again it is said one of appellants' witnesses was not allowed to testify as to whether he expected to inherit any property in New York, whereas several of appellee's witnesses were permitted to tell that they had such expectation. Not a witness for appellee was asked or answered any such question. What they were asked and allowed to answer was as to what representations Gridley made as to their having an interest in that property. Again it is said that one of appellants' witnesses was not allowed to testify as to his understanding as to what the $500 per month was paid to Gridley, whereas four of appellee's witnesses were allowed to testify in regard thereto. Such was not the case. Those four were present when the agreement with Gridley was made by the national association, and they testified as to what that agreement was—not their understanding of it. The objection to this testimony was frivolous and was properly overruled. Appellant's witness was not then present and his understanding in regard thereto was not material. These are the only "opposite rulings" quoted by ap-

pellants in their brief. They were not opposite rulings and the rulings in each instance were correct. They do not establish a prejudicial attitude toward appellants. On the contrary they bring out the frivolousness of objections which the court had to contend with.

■ (2) Repeated demands that appellants take the stand: The court never made any such demand. What is meant, as appears from what is said in support of this position, is that it indirectly demanded that they do so by calling on them to produce certain documents. But one instance of this is cited here. The use of the mails charged in the first and second counts of the indictment was the placing, on January 11, 1926, in the post office at Detroit a certain letter addressed to Gridley at his mailing address in New York City to be sent and delivered by the post office establishment, which they caused to be so placed and the taking and receiving of it on January 13, 1926, from the post office in New York City. The treasurer of the Detroit association testified that on the former date he mailed at Detroit a letter addressed to Gridley at New York City, which he registered, inclosing therewith three bank drafts payable to him for moneys collected on account of subscriptions to the book. The drafts, which were paid, were identified and introduced in evidence. The appellants objected to this evidence on the ground that the envelope and letter were the best evidence and that offered was secondary. Thereupon the court asked the United States attorney to give notice to the appellants to produce these documents and upon its being given overruled the objection and admitted the evidence. This is characterized as "one of the most high handed events of the trial." The decision of this court in the case of McKnight v. United States, 115 F. 972, is cited in support of this position. The case is not in point. The contents of the document whose production was demanded there were material and incriminating. Here such was not the case. Wilson v. United States (C. C. A.) 275 F. 307, 313. Had the contents of the letter been material, they could have been proven without notice to produce as was decided in the McKnight Case. The notice to produce was brought about by appellants' frivolous objection and was not prejudicial. Hanish v. United States (C. C. A.) 227 F. 584, 585.

The incriminating circumstance was the use of the mails. That was proven by the direct testimony of the witness, and his testimony was corroborated by the return receipt and a letter from Gridley acknowledging receipt of the drafts identified by the witness and read in evidence.

■ (3) Interruption and questioning of appellants' counsel during his opening statement. It is said that no less than forty questions and statements were so made by the court. The opening statement occupies sixteen pages of the transcript and the discussion between court and counsel occupies at least half of them. There were but four interruptions by the court. The main discussion referred to occurred at the conclusion of the statement. Not one of the four interruptions was improper and but one of them was of any significance and an indication of the attitude adverse to appellants. That was provoked by their counsel advancing the silly notion that there was a possibility of the descendants recovering the property because of the treaty between the British and the Dutch in 1664. This position was persisted in notwithstanding its repudiation by the court. The colloquy between the court and counsel caused thereby covers nearly four pages of the transcript. The advancing of such notion was an insult to the intelligence of the court and jury, and appellants cannot complain of the vigorous manner in which it was stamped upon. The opening statement is characterized here by appellants' counsel as "inartistic." The only matter stated therein that can be said to have constituted a defense to the indictment was that witnesses would be produced by appellants, who were present at the meetings when appellee's witnesses testified that Gridley stated that the descendants had title to and could recover the property and who would testify that no such statements were made. The only defense which was put forward was that which has been herebefore set forth which, as we have shown was no defense. The statement that the property could be recovered because of the treaty, which credited the testimony of one of appellee's witnesses that Gridley had made a similar statement in carrying out his program, supported the charge of the indictment. The further statements therein that Trinity Church had wronged the descendants and that they were morally entitled to the property and could recover it at the bar of public opinion, quotations to which effect are found in the preliminary statement, were unsupported by reference to any facts tending in the slightest degree to support it. It foreshadowed the testimony of appellants' witnesses that Gridley, to sell his book, had again and again resorted to this slander and thereby on their

own testimony established that the descendants had been the victims of a gross swindle.

The discussion between the court and appellants' counsel at the conclusion of his statement was occasioned by his making this statement at the beginning thereof, to wit: "I do not hesitate to say, your Honor, that Mr. Gridley is going to take the stand." It covered four matters—the persons who it had been stated helped Gridley in the preparation of his book, the manuscript which he had prepared, his books of account, and the number of the house which it was said he had rented to store the records he was accumulating and the street on which it was located. The court asked as to the names of such employees and the number and street of this house and that appellants produce the manuscript and books of account. It based the asking of such questions on the statement that Gridley was going to take the stand. They were asked in order that the truth as to such matter might be made clear and to facilitate the progress of the trial. No reasonable complaint can be made of the court's action in this particular. In this same connection criticism is made of the court's suggesting or asking that certain of appellants' witnesses produce certain documents testified to by them and particularly of what the court had to say in the course of the testimony of the New York book sellers. As to the documents the court simply called for the best evidence. The complaint made of the court's statements in the course of such testimony is that it belittled it and greatly minimized its effect as proof of appellants' good faith. It is said that this testimony absolutely wiped out of the case any intent to defraud. The testimony was objectionable on the ground that it was largely hearsay. The books should have been produced in order to determine their contents and what relation, if any, they had or could have to the book that Gridley was to prepare and publish. The witnesses could give but little account of them. Their statements regarding them were of a most general character. The only specific statements made are given in the preliminary statement. The only possible relation which such books could have to the book Gridley was to prepare and publish was as to the matters of general history which it was stated that it was to cover. It was not possible that they contained anything tending to show to the slightest degree that the descendants had title to the property and could and would recover it or that Trinity Church had wronged the descendants in relation thereto and it was rightfully theirs from a

moral point of view. No such claim on behalf of these books was put forward. The purchase of such books may have had a tendency to show good faith in the matter of preparing and publishing the book but it had no tendency whatever to make out good faith on Gridley's part in slandering Trinity Church's title or conduct in order to put his book over. The sole effect of this testimony was to mislead the jury and the court rightly condemned it.

(4) Comments during examination of witnesses. Seven instances of such comments are cited. The witnesses concerned were appellants and members of the association. One, a teacher of accounting in a business college in Los Angeles, who had come all the way therefrom to be a witness, testified that one of his reasons for joining the organization was the profit to be derived from the sale of the book. In inquiring on cross-examination as to whether the way things were carried on was good business, he was asked as to whether they had any contract with Gridley. His answer was that they had an implied one by reason of his acceptance of the money, the same as where a nickel is dropped in a street-car box there is such a contract. The court thereupon inquired as to "how it would be if he dropped his nickel in a card game, when you get three of a kind, you get a cigar, but if you don't you don't get anything." The fact that they were paying so much money over to Gridley without any written contract with him in relation to the book or any security for the money so paid was a subject of legitimate criticism. The illustration put by the court brought out the uncertainty inherent in the way things were carried on as to what they would get out of the enterprise. It was brought about by the witness' illustration and on objection being made thereto was stricken out. Another testified that a witness for the United States who had been an officer of the national association had in her hands $460 which she absolutely refused to turn over to the new organization. The court remarked that this was entirely proper; that anybody who had any money had better hold on to it until the matter was finally closed up and that if he had any money belonging to this organization he would keep it until some court told him what to do with it. The testimony had no place in the case and the remark complained of was sound and not improper. Another, a member of the Chicago local, was asked as to whether Gridley at a certain meeting had made the statement that he would

solve adverse possession. A witness for the appellee had testified that he had made such statement. Her answer was that she heard him say that. The court thereupon remarked that appellants' counsel meant to have her say the opposite. It would have been better to have said that the counsel expected her to say the opposite of which there can be no question. The proper word does not always come to one's mind. The remark was made to enable the witness to correct herself, which she did on the question being repeated. She also testified that her association had 62 members; that they met on the second and fourth Sundays of the month; that these meetings had a social aspect; and ever so often they got together and had a party, played bunco and cards and had a good time. The court asked her as to whether they had "Boomerangs," a little magazine issued by one of the associations, for prizes. The testimony was totally out of place. The court simply brought out the humor in the situation. Another, a crusader from California, who had tried the court's patience in stringing out her testimony, was asked if she knew why it was that they had not yet gotten the promised book. She answered that she did, "absolutely." When asked as to why it was, the court sustained an objection to the question, saying: "She thinks she knows, but she doesn't." She had no knowledge whatever on the subject. She merely had an opinion which was not competent. The court did not question her sincerity, only her knowledge in which it was correct. Another had testified that Gridley had said that the book would be a corrected history "or unwritten chapter" in the history of New York; that it would be a book of great value and that it would probably be used as a text book and libraries would have a copy of it. The court, thereupon, asked whether the book would be used "in the kindergarten or in the senior class as a text book." The general features of the proposed book were utterly irrelevant. The only material question in regard thereto was as to what it would contain in relation to Trinity Church property. As to its general features there was nothing known as to what Gridley could do that would justify the idea that he could prepare a book of such a character as was stated. If he made any such representation he was taking advantage here also of the gullibility of the descendants. The court here again by its remarks merely touched on the humorous aspect of the testimony. And finally on cross-examination of a witness who had testified that she had entered the organization for the reason, amongst others, that it was a business proposition, was asked as to what she had to show for her interest. In the discussion between court and counsel brought about by this question, the court used expressions which condemned the affair as a business proposition. The court's position here was entirely sound. There was nothing businesslike about it. The money was handed over to Gridley without any written contract with him or security therefor. There was no understanding as to what the new national association was to do with the moneys that were to come to it after its organization. And no member had any certificate or anything else to show what interest he or she had. In each of these instances except one the testimony which was the occasion of the remarks was immaterial and irrelevant. And no reasonable complaint can be made of the court's several remarks. They indicated the court's position as to the matters covered by them and had nothing to do with appellants' guilt or innocence of the scheme charged in the indictment.

We have thus dealt in the greatest detail with all the particulars put forward as tending to show that the court was not impartial in handling the case below and by reason thereof appellants were denied a fair trial. The court, in the trial, went through a very trying experience. The defense in the main, i. e., in so far as it rested on the fact that the descendants had sought out Gridley and that his work was to be confined to preparing and publishing a book and was not to be concerned with a lawsuit, was a sham. On appellants' own showing they had been guilty of a scheme to defraud the descendants. The only possible defense in the case was that they had not been guilty of the scheme specifically charged in the indictment. Sinister influences and outside pressure, in the main heretofore pointed out, were brought to bear upon the court and jury for the purpose of bringing about an acquittal irrespective of the merits. If under these circumstances, through its activity in the case, or its rulings, questions, or remarks, it oozed out of the court that it thought the appellants were guilty, it was provoked by the unusual situation with which it was confronted, which situation was brought about by the appellants, and such being the case it is not for them to complain of what they themselves caused. This feature of this case was entirely absent from the Sunderland Case. The charge to the jury was calm, impartial, and judicial. To meet the possibility that in the course of the trial it had indicated what it thought about the

facts of the case or the guilt of the appellants, it said:

"If anything has been said by the court or anything either in the way of possible implication or suggestion in the way of asking a question, and I say the same thing about counsel in the case, you ignore that, because it is not a question of what counsel thinks as to the witnesses or facts, it is not a question of what the court thinks; that is your province, and I have no desire to invade it if I did. I have a right in the Federal Court to comment on the evidence and I should do that frankly looking you in your faces if I desired to do it and I would not resort to any subterfuge to do what I have a right to do if I so desired and I do not desire to do so in this case. I have full confidence in your ability to take this evidence and decide this case justly."

In view of all these considerations, we must overrule the contention that the appellants were denied a fair trial by the court and that because thereof the judgment should be reversed.

■ 2. Misconduct of the United States attorney: This is laid on the court. He was encouraged to do as he did by the court's attitude. Only four particulars are specified. Note need be taken of but one of them. The others are too trivial to call for consideration. That one is that he stated to the jury that he believed the appellants were guilty. He was led to make this statement by the charge of appellants' attorney in his speech that he was seeking an unjust conviction by his ambition to win. Upon objection being made to this statement, at the conclusion of his argument, the court said:

"Well I will say this to the jury. They will pay no attention to this, but as to Mr. Watkins let me say that counsel having charged him with improper motive, he was fully justified in defending himself, after those very unjust, improper charges preferred against Mr. Watkins and was abundantly justified in denying the unjust accusations made against him and defending himself, but I do say to the jury that they are not concerned with the opinion of counsel as to what he thinks about the guilt or innocence, and they will ignore that and pay no attention whatever to it, and he was driven into that statement by the unfair accusations made against him."

Appellants have no reason to complain here.

■ 3. Overruling two motions to quash the indictment and a motion that they be per-mitted to withdraw their plea of not guilty and to file a plea in abatement:

The first motion to quash the indictment was made at the time of arraignment and on the ground that one of the grand jurors was not assessed on the assessment roll. It was subsequently waived by stipulation, but is insisted on here. Section 275 of the Judicial Code (28 USCA § 411) provides that jurors in the United States courts shall have the same qualifications as jurors of the highest courts of law in such state. Section 12190 of the Compiled Laws of 1915 of Michigan provide that jurors shall be selected from the persons assessed on the assessment roll. But sections 15708 and 15709 thereof limit the grounds of challenge of grand jurors to the persons challenged being a prosecutor or complainant. He is not subject to challenge on the ground that he is not so assessed. People v. Lauder, 82 Mich. 134, 46 N. W. 956; People v. Smith, 118 Mich. 74, 76 N. W. 124. But apart from this, such fact does not go to the qualifications of a grand juror within the meaning of the provision of the Code. United States v. Collins, 25 Fed. Cas. 545, No. 14837; United States v. Benson (C. C.) 31 F. 896; United States v. Mitchell (C. C.) 136 F. 896. The second motion to quash was based on four grounds, to wit: Presence of postal inspector in a grand jury room; coercion by assistant district attorney; no evidence was introduced before the grand jury that the crime charged had been committed; and the indictment was fatally defective. Each of the first three grounds was controverted by answer. The burden was on appellants to establish them. The matter was heard on affidavits pro and con. The appellants failed to sustain their burden. It appeared that neither ground was well taken. Sixteen particulars were specified as to wherein the indictment was defective. But one is argued, and that is that it was indefinite, uncertain, unspecific, and vague. Such is not the case. The indictment specifies who were to be defrauded and is specific as to the nature of the scheme to defraud as to the elements thereof referred to at the outset of this opinion, whatever may be the case as to the elements the nature of which we have not stated. This was sufficient to render the indictment good. The motion to quash was properly overruled.

The motion for permission to withdraw the plea of not guilty was in order to the filing of the demurrer and plea in abatement which was accompanied by affidavits. It was made and heard the day before the day the

case was set for trial over eleven months after the finding of the indictment. The grounds of the demurrer and plea in abatement were the same as those urged in the second motion to quash. It was discretionary with the court to allow the plea of not guilty to be withdrawn. United States v. London (D. C.) 176 F. 976; Philipps v. United States (C. C. A.) 201 F. 350. The questions raised by the demurrer and plea in abatement were the same as those raised by the second motion to quash which had been disposed of adverse to appellants and the plea came too late. Benson v. United States (C. C. A.) 240 F. 413.

4. Errors in admission and exclusion of evidence: Under this item there are a number of divisions and subdivisions and many rulings are assigned as error. We do not feel called upon to take up each one of them and deal with it separately. A feature of the trial below was the great number of objections made by appellants to questions asked of witnesses, to the introduction of exhibits, and to remarks made by the court. Very few, if any, were well taken and as far as well taken, the rulings were harmless. A disposition to make frivolous objections is indicated by those thus far considered. This necessitated a multiplicity of rulings. And not a one of them has escaped complaint here. A few of the assignments covered by this item will be considered specifically. As to the rest it is sufficient to say that we have considered them carefully and find that they are not well taken.

It is urged that the three drafts sent by the Detroit treasurer to Gridley, the mailing of the letter which enclosed them, constituting the use of the mails charged in the first and second counts of the indictment, should not have been allowed to be introduced in evidence. Two reasons are urged. Appellants did not place the letter in which they were inclosed in, the Detroit post office. The Detroit treasurer did that. Nor did they cause it to be placed therein. He placed it there by direction of the Detroit association. This is too narrow a view of the word "cause" in the statute. In the case of United States v. Kenofskey, 243 U. S. 440, 37 S. Ct. 438, 439, 61 L. Ed. 836, it was said: " 'Cause' is a word of very broad import and its meaning is generally known. It is used in the section in its well-known sense of bringing about."

Appellants brought about this use of the mails. They started and pushed along the obtaining of subscriptions to the book which Gridley was to prepare and publish, the payment thereof to the treasurer of the local associations, and the remission of the collections made by him to them.

The other reason is that the moneys so remitted were for the preparation and publication of the book. That is true, but if to induce subscriptions to the book and payment thereof representations of the character charged in the indictment were made—the book to contain the information and evidence to which the representations related—there was in existence the scheme to defraud there charged and the placing of the letter inclosing the drafts in the post office was for the purpose of executing that scheme. Thereby in fact the scheme was executed.

Again, it is urged error was committed in allowing certain writings to be introduced in evidence without proper identification. They were unsigned communications from New York to the descendants. Gridley had the understanding with them that communications from him were not to be signed. The writings in question were sufficiently identified by their not being signed, the nature of their subject-matter, and that they came from New York to the descendants.

Again, complaint is made of the admission in rebuttal of the decision of the New York Supreme Court disbarring Gridley in 179 App. Div. 621, 167 N. Y. S. 107. The admission was limited to the fact that he had been disbarred and the date of disbarment. The opinion was not read in evidence. No possible harm came to appellants from this evidence. That he had been disbarred and that for connection with this Bogardus matter was an admitted fact in the case. It was set forth in the questionnaire. Practically every witness on both sides testified that Gridley on every occasion told all parties that he had been disbarred. In appellants' brief it is said, "Nobody disputed it."

Still further error is assigned in refusing to permit the introduction of certain evidence as to material in the way of books acquired by Gridley for use in the preparation of the book he was to publish. The New York book sellers were allowed to tell all they knew in regard to the books purchased from them, which testimony is fully set forth in the preliminary statement. Two witnesses were not allowed to testify as to certain material which they saw and packed in Gridley's apartment in New York City and transported by truck to Detroit after the finding of the indictment or what Gridley said about it. Another witness was not allowed to testify as to certain maps shown her the day before as having been exhibited at the Detroit meeting Febru-

ary 2, 1925, at which she was present. It is the exclusion of this evidence of which complaint is made. This material should have been produced in court and identified by the witnesses so that its relevancy could be determined from an inspection of the material itself. But it is certain that it was not relevant. The sole possible bearing thereof was as tending to show that Gridley was contemplating preparing a book, if not actually engaged in so doing, containing the general matter referred to in his statements to the descendants. It could have had no tendency whatever to establish that he had information or evidence that the descendants had either the legal or moral right to the property in question which he would set forth in the book. It was not claimed that it had any such tendency. For this reason the testimony of the New York book sellers was irrelevant and could properly have been excluded.

These several alleged errors covered by this item which have been considered in detail are samples of the errors so covered which have not been considered.

5. Denial of appellant's motion to declare a mistrial because of the publicity given by the Detroit newspapers of the hearing had in the court room in the absence of the jury as to the misconduct of the appellants Wright and Roen is assigned as error. The headlines of the newspapers and certain expressions of the court in regard to the matter and Gridley's misbehavior of the previous day, which were quoted, are particularly complained of. It was not made to appear that the newspapers had been read by any of the jurors. They had been warned not to read newspaper accounts of the trial, and in the absence of evidence to the contrary, it was to be taken that they had obeyed this warning. Gridley's misbehavior had taken place in their presence and that of Wright and Roen was in connection with two of the jurors. The court in commenting on what had happened said nothing amiss.

6. An amendment of the indictment is assigned as error. The use of the mails covered by the third and fourth counts thereof was alleged to have occurred in December, 1926. As a matter of fact it occurred in December, 1925. On appellee's motion it was permitted to amend the indictment by striking out the figure six and substituting therefor the figure five. As a matter of fact no alteration of the indictment was made. As copied in the record the date is in December, 1926. No amendment was needed as the date was not material. And at most only those two counts would be affected. The verdict was guilty as to all the counts and the punishment imposed did not exceed that which might be imposed on one count.

7. At the close of appellee's evidence, appellants moved to strike from the record all testimony pertaining to any conversations, letters, or documentary proof of any kind more than three years prior to the finding of the indictment. Apparently this was based on the idea that any scheme to defraud that existed more than three years before such finding was barred by the statute of limitations. But the gist of the offense is not the scheme to defraud but the use of the mails for the purpose of its execution. Here the use of the mails charged occurred within three years of the indictment. The scheme to defraud may be traced from its beginning even though that is more than three years before. But a possible view of the motion is that what was sought to be eliminated was evidence as to what had transpired before the disbandment of the national association. If so it should have been directed specifically to such evidence. The national association was disbanded not later than November 1, 1923. The motion to strike all that had transpired more than three years before covered what had transpired from November 1, 1923, to March 2, 1925, under the new arrangement which clearly was competent. But the sole change after November 1, 1923, from what went before was as to Gridley's having anything to do with a lawsuit. However it may have been before that date, he was not thereafter to have anything to do therewith. His efforts were to be confined to the preparation and publication of a book. But there was no change in his representations as to the information and evidence he possessed and had access to. According to appellee's evidence, after as well as before, it was such as to establish the descendants' legal right to the property; according to appellants, their moral right thereto. The fact that there was a difference in the way in which he was to help them establish such right by furnishing them such information—before the disbandment in a lawsuit, after in a book—did not render what had transpired before the disbandment inadmissible. It was essential in tracing the scheme to defraud from the beginning.

8. Error is assigned in overruling appellants' motion to direct a verdict of acquittal at the close of all the evidence. This is based on the conceded fact that at the time of the use of the mails charged the

scheme did not involve Gridley's having anything to do with a lawsuit. It involved only the preparation and publication of a book. From what has already been said it is apparent that this assignment is not well taken.

9. The refusal to give certain requested instructions is assigned as error. It is urged that this instruction should have been given, to wit:

"You are not to consider any evidence pertaining to the period before March 2nd, 1925, as proof of any overt act or scheme to defraud as charged in the indictment; such evidence shall be considered by you only in so far as it bears upon the criminal intent or good faith of the defendants."

This concedes the right to consider such evidence as it bore upon the criminal intent or good faith of the defendants. It excludes it simply "as proof of any overt act or scheme to defraud as charged in the indictment." The indictment charged no such overt act and the statute required no overt act or the scheme.

Again, it is urged that this instruction should have been given, to wit:

"I further charge you members of the jury that if you find from the evidence that some of the members of this society intended to use the book when published in furtherance of any fraudulent scheme or lawsuit and that such fraudulent scheme or lawsuit was beyond the intent or control of the defendants, such facts cannot be considered by you in determining the guilt or innocence of the defendant".

Such evidence was entitled to be so considered as bearing on the question as to whether Gridley had made representations that the contents of the book could be so used. The descendants knew nothing as to what the book was to contain except what they gathered from Gridley's representations and they could have had no such intention unless he had made such representations.

And again, it is urged that this instruction should have been given, to wit:

"I further charge you in connection with the lack of good faith that in this case such good faith or lack of good faith can only be determined by circumstantial evidence and if all the evidence as to such fact is as fairly consistent with innocence as with guilt, then you shall return a verdict of not guilty."

It is the latter part of the instruction that is insisted on. It was given in the charge in substance in these words:

"If the testimony produced here upon the part of the government can be reconciled upon the theory of innocence then it is your duty to return a verdict of not guilty."

10. Complaint is made of certain portions of the charge. No exception was taken thereto and the complaint is not sound in either particular. Exception was taken to the charge as a whole on the ground that it was argumentative. It was claimed in the brief that it was unduly argumentative. Such was not the case. It was not argumentative at all. It was a cool and dispassionate statement of the law applicable to the case as the court conceived it to be. The only thing which was stressed in it was the necessity of a criminal intent to defraud on appellants' part in order to their conviction. The jury was told that if appellants acted in good faith they should be acquitted. What the court said in this particular measured fully up to what appellants were entitled.

Our conclusion, therefore, is that the judgment of the lower court must be affirmed.

### No. 5568.

The contempt involved in this proceeding consisted in appellant Gridley's advancing toward a witness on the stand whilst he was testifying and saying, "You are a damned liar," to which reference has been made in that portion of the preliminary statement dealing with the climate of the trial. The witness testified that Gridley at the time of his employment by the national association, said that one Caligeri, who had testified against him in the disbarment proceeding, had given him an affidavit to the effect that he had testified falsely and had been hired by Trinity Church to do so, on the strength of which he could be reinstated. He had further said that Caligeri told him that after so testifying he was sent out of the country with his wife and children, all of whom he buried, and seeing that his luck was so bad he had come back to tell Gridley that he was sorry for what he had done. It was upon the giving of this testimony that Gridley misbehaved in the manner stated. It was uncertain on the face of things what portion of this testimony Gridley intended to denounce as a lie, whether that Caligeri had given him such an affidavit or that he had left the country with his family. According to Gridley's testimony below, it was the latter. Gridley testified that Caligeri was not a married man and had no family. Immediately upon this remark of Gridley, the court started to say something, but it got no further than the word "Now," when Gridley said, "I cannot help it." This

conduct on the part of the appellant was "misbehavior in the presence of the court" within the meaning of section 385, USCA, tit. 28, and hence a contempt of court. United States v. Emerson, 25 Fed. Cas. 1012, No. 15050. Such being the case, appellant could have been adjudged guilty and sentence could have been imposed then and there without more ado. In the case of Cooke v. United States, 267 U. S. 517, 45 S. Ct. 390, 394, 69 L. Ed. 767, the court said:

"To preserve order in the courtroom for the conduct of business, the court must act instantly to suppress disturbance or violence or physical obstruction or disrespect to the court. * * * There is no need of evidence or assistance of counsel before punishment, because the court has seen the offense. Such summary vindication of the court's dignity and authority is necessary. It has always been so in the courts of the common law, and the punishment imposed is due process of law."

The purpose of the exercise of such summary jurisdiction, as stated in Re Robinson, 19 Wall. 505, 511, 22 L. Ed. 205, is "to insure order and decorum" in the presence of the court. The court did not thus dispose of this contempt. It gave direction to adjourn court to the following morning and to take Gridley to its chambers. No further notice was taken of the misbehavior until some time after the close of the trial. The court was led not to act summarily because it did not desire to prejudice appellant by adjudging him guilty of contempt in the presence of the jury and to avoid error. An information for contempt was filed May 20th and hearing was had July 8, 1929. Answer was filed admitting the misbehavior charged in the information. The court took notice of what had occurred in its presence and the transcript thereof was introduced. Appellant testified in his own behalf. He was adjudged guilty of contempt and sentenced to six months imprisonment to run consecutively with the sentence imposed in the main case, which was five years in the penitentiary. Two considerations are against affirming this sentence. The court considered irrelevant matters in determining the degree of guilt and fixing the amount of punishment. The matters so considered were that the descendants provided funds for his support, and defense, that one of them, other than Mrs. Roen, attempted to influence one of the jurors, that typewritten copies were furnished appellant's witnesses of what answers they were to make to certain questions when asked them on the stand, and that connected with the defendant was the person who had been sentenced by the court to the penitentiary for conspiracy to violate the National Prohibition Law (27 USCA) and who had, according to the information of the court, had the reputation of being a jury fixer and blackmailer. Over appellant's objection he was cross-examined by the United States attorney and the court in regard to these matters and the last one of them was dwelt on by the court in giving the reasons for its action. Neither one of them had any legitimate bearing on the degree of appellant's guilt or the punishment which should be imposed. That a judgment of conviction for contempt should be reversed where incompetent evidence is introduced on the hearing, even where the case is heard by the court, was held in Oates v. United States (C. C. A.) 223 F. 1013, 1014. It was there said:

"It is true the court in its decree recites that it bases its finding upon 'the legal evidence produced upon the trial rejecting all improper and irrelevant parts thereof,' but hearsay evidence was admitted, and it is impossible for this court to say from the record what the District Judge ultimately rejected and whether any of the incompetent testimony influenced his findings or the extent of the punishment inflicted."

The other consideration is that the court based its sentence on the finding that appellant's misbehavior was deliberate. Several motives are referred to as inducing it. It was for the purpose of getting the court to commit error or to impress the jury that the witness was testifying falsely. The final conclusion was that it was for the purpose of bringing about a mistrial. The reasonable conclusion is that it was spontaneous. Immediately thereafter appellant said, "I cannot help it," and in chambers where he was taken he apologized. It is possible, at least, that the witness' testimony, in the particular stated, was untrue. According to appellant's testimony he was then and had been for more than two years laboring under a great strain, which may have affected his self-control. The lack of it may have been due in part to his consciousness of the backing he was receiving from his victims. This was calculated to embolden him somewhat. But, however this may have been, the matter should have been disposed of on the basis that the misbehavior was due to lack of self-control and spontaneous. The conclusion is that the judgment must be reversed, and the case remanded for further proceedings consistent herewith.

## No. 5569.

The contempt here involved is the misbehavior of appellants heretofore referred to in the preliminary statement in No. 5576. Information was filed against them at the same time the information was filed in No. 5568 and the hearing was had at the same time. They were adjudged guilty of contempt and sentenced to six months' imprisonment, in the case of appellant Wright, to run consecutively with the sentence imposed in the main case, which was four years in the penitentiary. The evidence heard was the testimony of one of the two women jurors concerned and that of the appellant Roen. As to what took place there was not much difference in their testimony. According to the testimony of the woman juror, what took place was this: She and her co-juror, on the second day of the trial, at the noon recess, went to a certain hotel in Detroit about four blocks from the government building for lunch. Before going to lunch they went into the washroom and as they were about ready to leave the appellants came in. She heard a voice behind her which she saw came from appellant Wright saying, "Perhaps I ought to say I am Mrs. Wright so that you won't be talking about the case." She saw them come in, and this statement was made as quick as they entered. She did not make answer, but her co-juror said, "Well, I guess we know who Mrs. Wright is." Appellant Roen then spoke up and said: "I do not know that it would be proper, but I would like to introduce you to Mrs. Wright. She has been a very dear friend to me and just like a mother." Appellant Wright then spoke up and said, "Well, anyway, whether we are introduced or not, we want you to know that we have a very intelligent jury." This was all that was said. She testified that before appellant Wright started that conversation she and her co-juror were not talking about the case. She told her co-juror about having heard Ruth Bryan Owen speak a night or two before and her co-juror then told her that through her father they had known the Bryan family in Nebraska and how much she would like to have heard her. She continued that "they were just talking about the articles running in the Liberty magazine about the Bryan matter."

Appellant Roen's account of what took place was this: The first thing she heard was the woman juror who did not testify say, "You know a great many years ago my father or brother received some literature or magazine or something to that effect." They took it that the jurors were talking about the case and appellant Wright said, "Ladies, I am Mrs. Wright, the defendant in the case, and I wish that you would not talk here while I am in here, because it would not be fair form to let you talk." The other juror then said, "Well, that is honest, Mrs. Wright, and we want to thank you." Then she said: "Well, if it would not be improper, I would introduce you. Mrs. Wright is the best friend I have." Appellant Wright then said, "I think we have a very intelligent jury."

The first question to be considered is whether both or either the appellants were guilty of "misbehavior" on this occasion and whether it was "so near" to the court "as to obstruct the administration of justice." In so far as there was misbehavior on the part of the appellant Roen, it was in telling the jurors how dear appellant Wright was to her. And as to the appellant Wright it was in complimenting the jury. We think that each appellant's conduct came within the statute in each particular. The question as to whether there was such misbehavior as to constitute a contempt does not depend on whether the appellants intended by what they said to influence the jurors or that they were influenced thereby. In the case of Toledo Newspaper Co. v. United States, 247 U. S. 402, 38 S. Ct. 560, 564, 62 L. Ed. 1186, it was said:

"Not the influence upon the mind of the particular judge is the criterion but the reasonable tendency of the acts done to influence or bring about the baleful result is the test. In other words, having regard to the powers conferred, to the protection of society, to the honest and fair administration of justice and to the evil to come from its obstruction, the wrong depends upon the tendency of the acts to accomplish this result without reference to the consideration of how far they may have been without influence in a particular case."

In the case of Kelly v. United States (C. C. A.) 250 F. 947, 950, it was said:

"In order that one may be held for contempt for communications with jurors, on the ground of the harmful tendency thereof, it is not necessary to prove that the communications had or the acts done were accompanied with a wrongful intent. It is sufficient if such acts and communications were knowingly and willfully done and had, and had the tendency to influence improperly the action of the jury."

It was said further:

"It may be taken for granted that jurors of ordinary intelligence and fairness may not be influenced by such things as were done

here; but the matter must be judged by its natural tendency to affect weak jurors, or those who are easily influenced. All will agree that it is of the utmost importance that juries be jealously guarded against all improper influences, and that public policy, as well as the honor of the bar, requires that jury trials be beyond suspicion. To that end it is essential that there be no exchange of favors, and no personal or social intercourse between the parties litigant, or their attorneys or friends, and the jurors who are called to decide the issues of a pending case."

Here there was social intercourse, though to a very limited degree, brought about by appellants. The one told the jurors how dear the other was to her and the other complimented the jury. Jurors should not be subjected to such expressions by litigants or their friends. These things were knowingly and intentionally said, and it is hard to resist the conviction that the statements were made for the purpose of affecting, if not influencing, the jurors. They cannot reasonably be accounted for on any other ground.

Then, as to whether the misbehavior was in such proximity to the court as to come within the statute, this is to be said: In the case of Ex parte Cuddy, 131 U. S. 280, 9 S. Ct. 703, 705, 33 L. Ed. 154, the court said:

"Whether the attempt to influence the conduct of the term trial juror McGarvin was or was not, within the meaning of the statute, misbehavior so near to the court 'as to obstruct the administration of justice,' however distant from the court building may have been the place where the appellant met him, is a question upon which it is not necessary to express an opinion."

In the case of Ex parte McLeod (D. C.) 120 F. 130, 141, it was said:

"What is meant by the words 'so near thereto' has not been defined by judicial decision. In view of the evil intended to be suppressed, they mean not the place where the 'misbehavior' is committed, but the power of the 'misbehavior' to harm the administration of justice. If the force put in motion by the 'misbehavior,' at whatever place it is committed, assails or threatens the authority and independence of the court, then the 'misbehavior' is 'so near thereto' as to be punishable under this section."

If a litigant or his friend, whilst a case is on trial in court, approaches a juror in such a way as to constitute misbehavior within the meaning of the statute such misbehavior is so near to the presence of the court as to obstruct the administration of justice within its meaning no matter where it takes place. The decision in the Kelly Case is authority for the position that the misbehavior complained of here is within this portion of the statute. So is the decision of this court in Burneson v. United States, 19 F.(2d) 780.

Here also two considerations exist against the affirmance of this sentence. The court considered irrelevant matter in determining the degree of guilt and fixing the amount of punishment. The matter so considered was two of the items considered in the contempt proceeding against Gridley, to wit, the second and fourth. It considered an additional item, to wit, appellant Roen's connection with the burning of appellant Gridley's manuscript set forth in the preliminary statement to the main case. And the court based its sentence on the finding that the appellants had followed the two jurors to the washroom for the purpose of approaching them as they did. The evidence did not justify this finding. The appellants were stopping at that hotel and had been there for two days. This was the first time that the two jurors had been there. They had gone there for lunch. Appellant Roen testified that the meeting was accidental. That such was the case should have been accepted as there was nothing to the contrary. Furthermore, in what was said that there was no concert on the part of the appellants. The remark of one led to that of the other without any previous understanding. And still further it is not unlikely that appellant Wright may have thought the jurors were talking about the case. In talking about the Bryans the juror referred to her father and to the Liberty Magazine. Appellant Wright may have thought that she was speaking about her father having read some magazine about the Bogardus matter. And it is possible that her concluding remark was somewhat jocular. Notwithstanding these considerations, we cannot acquit them of having been guilty of a contempt of court, but the punishment imposed should be in the light of them.

The judgment is reversed, and the case remanded for further proceedings consistent herewith.